UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
No. _____

United States of America,

    Plaintiff,

v.

$33,000.00 in United States Currency,

    Defendant.

**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

Plaintiff United States of America, through its attorneys Erica H. MacDonald, United States Attorney for the District of Minnesota, and Andrew Tweeten, Assistant United States Attorney, in a civil cause of action for forfeiture, alleges as follows in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure:

## NATURE OF THE ACTION

1. This is an action to forfeit and condemn to the use and benefit of the United States of America $33,000.00 in United States Currency for violations of 21 U.S.C. § 841 *et. seq*.

## THE DEFENDANT *IN REM*

2. The Defendant *in rem* is $33,000.00 in United States Currency ("the Defendant Currency") seized from Humberto Guebara Torres on November 13, 2019. The Defendant Currency is in the custody of the United States Marshals Service.

## JURISDICTION AND VENUE

3. Plaintiff brings this action *in rem* in its own right to forfeit and condemn the Defendant Currency. This Court has jurisdiction over an action commenced by the

United States under 28 U.S.C. § 1345 and over an action for forfeiture under 28 U.S.C. § 1355(a).

4.      This Court has *in rem* jurisdiction over the Defendant Currency under 28 U.S.C. § 1355(b). Upon filing of this Complaint, Plaintiff requests that the Clerk of Court issue an arrest warrant *in rem* pursuant to Supplemental Rule G(3)(b)(i), which the Plaintiff will execute upon the Defendant Currency pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

5.      Venue is proper in the District of Minnesota pursuant to 28 U.S.C. § 1355(b)(1) because acts or omissions giving rise to the forfeiture occurred in this District, and pursuant to 28 U.S.C. § 1395 because the Defendant Currency is located in this District.

**FACTS**

6.      On November 13, 2019, members of Drug Enforcement Administration (DEA) Minneapolis Group 73 and the Minneapolis/St. Paul Airport Police Department (APD) Narcotics Unit, Sgt. Morrison, Det. Meyer, and TFO Duzan, all in plain clothes and not wearing any police markings, were conducting surveillance at the Humphrey Terminal at Minneapolis/St. Paul International Airport.

7.      At. 2:13 p.m. on November 13, 2019, Sgt. Morrison, Det. Meyer, and TFO Duzan received information from TFO Irvin that his canine partner "Jackson", a United States Police Canine Association certified narcotics canine, had alerted to the presence of a narcotics odor emanating from a checked bag. The bag was checked by

Humberto Guebara Torres (hereinafter "Torres"), and was set to travel from MSP to LAX on Sun Country flight 425, Departing at 3:05 at Gate H3.

8. Los Angeles is a source of illegal narcotics and Minnesota is a destination for consumption of those narcotics.

9. Drug Trafficking Organizations (DTO) often supply narcotics to consumption areas and collect money from distributors in consumption areas to return to the organization.

10. Det. Meyer approached a Sun Country Gate Agent at Gate H3 and asked him if he would page Torres to the podium. The gate agent paged Torres several times, but Torres never approached the podium.

11. To locate Torres, Sgt. Morrison observed a Sun Country employee at Gate H3 as the employee scanned passengers' boarding passes and watched for Torres's name.

12. After the boarding pass scanner failed during the boarding process, the Sun Country employee stopped scanning the boarding passes and began to take them by hand without scanning them. During this time, Sgt. Morrison was unable to see the names of the individuals boarding the flight. A short time later, the scanner began to work again. Sgt. Morrison did not see Torres's name on any of the scanned boarding passes.

13. Sgt. Morrison then asked the Sun Country employee if she could check if Torres had boarded the flight. The Sun Country employee indicated that Torres had boarded the flight and was seated in seat 19F.

14. Sgt. Morrison and Det. Meyer walked down the Gate H3 jet way. When they reached the entrance to the aircraft, Sgt. Morrison identified himself to a Flight Attendant. Sgt. Morrison asked the Flight Attendant if she could call Torres to the jet way. After the Flight Attendant called Torres, a Hispanic male walked to the front of the plane and looked in Sgt. Morrison's direction.

15. Sgt. Morrison identified himself and asked the Hispanic male if he was okay speaking with him. The Hispanic male said "of course." Det. Meyer then identified himself.

16. Sgt. Morrison asked the Hispanic male if he was Humberto Torres. The Hispanic male confirmed that he was Humberto Torres.

17. Sgt. Morrison informed Torres that he was not in any trouble and that he was not under arrest and then asked Torres if he was willing to speak with Law Enforcement. Torres agreed.

18. Sgt. Morrison asked Torres if he knew why the narcotics canine would have alerted to his checked bag. Torres responded that he did not know why the canine would have alerted to his bag. Sgt. Morrison observed that Torres did not have any difficulty conversing in English.

19. Sgt. Morrison asked Torres if he had packed his bags himself. Torres stated that he had.

20. Sgt. Morrison asked Torres if anyone had asked him to put anything in his luggage. Torres stated that nobody had.

21. Sgt. Morrison asked Torres if he was able to sneak anything through security such as knives, razor blades, explosives, or firearms.  Torres stated "no."

22. Sgt. Morrison asked Torres if he had packed any street drugs or prescription medication.  Torres stated that he had not.

23. Sgt. Morrison asked Torres if he packed any large amounts of currency. Torres stated that he had "about $20,000.00 in the bag but it's my boss's."

24. Sgt. Morrison then asked Torres if he would allow TFO Irvin to search his checked bag.  Torres stated "yes."  Sgt. Morrison then contacted TFO Irvin and told TFO Irvin that Torres had agreed to allow a search of his checked bag.

25. At approximately 3:01 p.m., TFO Irvin searched Torres's checked bag and found a large quantity of United States Currency.

26. Sgt. Morrison asked Torres if he would allow Det. Meyer search a backpack that Torres was wearing.  Torres said "yes."

27. As Torres handed Det. Meyer the backpack, he stated "I have about $8,000 in there."

28. Det. Meyer opened the backpack and observed three bundles of United States Currency in the bottom of the backpack.  Each bundle was held together by rubber bands.

29. Currency proceeds of drug trafficking are often packaged in bundles held together by rubber bands.

30. Sgt. Morrison asked Torres why he was traveling with so much currency. Torres responded that he arrived yesterday to purchase a restaurant for his boss.

31. Sgt. Morrison asked which restaurant.  Torres replied "El Parian."

5

32. Sgt. Morrison then asked where the restaurant was located. Torres replied "around here," while pointing around.

33. Sgt. Morrison asked Torres how he got to the restaurant. Torres stated that a friend gave him a ride. When Sgt. Morrison asked Torres his friend's name, Torres was unable to remember.

34. Sgt. Morrison asked Torres if he had any paperwork verifying the purchase of the restaurant or any paperwork showing the withdrawal of the currency from a bank. Torres stated that they did not end up buying the restaurant.

35. Sgt. Morrison asked Torres if he had ever been arrested. After initially indicating that he had not ever been arrested, Torres stated that he had been arrested a long time ago for smoking marijuana.

36. Sgt. Morrison then observed the Flight Attendant making preparations to close the door to the aircraft. Sgt. Morrison asked Torres to accompany him and Det. Meyer to their office so that they could take further steps to verify the origin of the currency. Torres stated that he would come back to the office if he could get rebooked on a later flight. A Sun Country Gate Agent indicated to Sgt. Morrison that Torres could be rebooked on a later flight. Torres then agreed to accompany the officers to their office.

37. After they returned to the terminal, at the podium near Gate H3, Sgt. Morrison asked Torres for his identification. Torres handed Sgt. Morison a California Driver's License with a photo matching his appearance and the name Humberto Guebara Torres. Sgt. Morrison returned the Driver's License to Torres.

38. Det. Meyer escorted Torres to an interview room at the APD office. They arrived at approximately 3:14 p.m. TFO Duzan and Det. Meyer were present in the room with Torres. The door was open.

39. The officers informed Torres that he was not under arrest. Torres stated that he understood.

40. During the interview, Torres stated that he was in Minnesota because his boss, the owner of "El Toro Bravo" restaurants in California, had asked him to visit a restaurant in Minnesota and to potentially make arrangements to purchase it. Torres stated that he had the money in the event that a down payment was needed to buy the restaurant.

41. The officers asked Torres for information about his boss. Torres said his boss's name was Cecil Marcettey, spelled M-A-R-C-E-T-T-E-Y, and provided a phone number, (949) 922-4840.

42. Torres further explained that he flew to Minneapolis on November 12, 2019 (the day prior) at around 6:00 a.m.

43. Torres said that after he landed at the airport he took an Uber to his boss's friend's house. He could not remember the boss's friend's name or the location of his house.

44. Torres stated that his boss's friend then brought him to the restaurant, El Parian, to sample the menu.

45. Torres did not know the location of the restaurant, but believed it was about 20 minutes from the airport.

46. Torres could not remember who he met with at the restaurant. Torres stated he thought the person at the restaurant went by the name "Saul."

47. At around 3:25 p.m., Torres used his cellphone to call his boss. Torres briefly explained the situation and then handed the phone to TFO Irvin, who had joined the officers in the interview room.

48. TFO Irvin spoke on the phone with an adult male who identified himself as "Cesar Martinez." Martinez stated that he was the owner of the El Toro Bravo restaurant in Orange County, California. He indicated that Torres had stayed with his friend Rojelio Perez. He stated that Torres works for his restaurant and was sent to Minnesota to look at a restaurant for sale. Martinez stated that he did not know the precise location of the restaurant but he believed it was somewhere between Roseville, Minnesota and Columbia Heights, Minnesota. Martinez advised that the officers could call him at his restaurant at (714) 665-1400 if they had any further questions. The conversation ended when Martinez asked to speak with Torres again and the officers returned the cellphone to Torres.

49. The officers later determined that the El Toro Bravo is owned by Cecil Murrietta, not Cesar Martinez.

50. At approximately 3:30 p.m., TFO Duzan located the phone number for El Parian, a Mexican restaurant in Eagan, Minnesota. TFO Duzan called the number and made contact with an individual who identified himself as "Francisco." TFO Duzan asked Francisco if El Parian was for sale. Francisco confirmed that the restaurant was for sale. TFO Duzan then asked whether anyone had come to the restaurant in the past two days to

discuss purchasing the restaurant. Francisco stated that nobody had been to the restaurant to discuss the sale in the past two days.

51. At around 3:35 p.m., Torres gave TFO Irvin permission to look at his cellphone. TFO Irvin observed photos on the phone that appeared to show many packages that looked like narcotics wrapped for transport and sale. TFO Irvin asked Torres about the photos. Torres stated that he was ready to leave.

52. Torres was informed that the currency in his checked and carry-on bags was being seized as proceeds of narcotics trafficking. Currency divided into bundles held by rubber bands was retrieved from Torres's checked and carry-on bags. The currency was placed in evidence. At approximately 3:50 p.m., Torres signed the evidence packaging confirming that it was sealed in front of him.

53. At approximately 3:51 p.m., Torres placed a call on his cellphone and explained that the currency had been seized and that they would receive information by mail to contest the seizure.

54. Torres's personal belongings were returned and he was escorted to the Sun Country ticket counter for assistance in rebooking a flight to Los Angeles.

## BASIS FOR FORFEITURE

55. The allegations in the preceding paragraphs are re-alleged and incorporated by reference.

56. The Defendant Currency is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it was furnished or intended to be furnished in exchange for a

controlled substance, constitutes proceeds traceable to such an exchange, or was used or intended to be used to facilitate a violation of the Controlled Substances Act.

## CLAIM FOR RELIEF

57. Plaintiff requests that the Court issue a warrant for the arrest and seizure of the Defendant *in rem*, that notice of this action be given to all persons who reasonably appear to be potential claimants of interests in the Defendant *in rem*, that the Defendant *in rem* be forfeited and condemned to the United States of America, that the Plaintiff be awarded its costs and disbursements in this action, and for such other and further relief as this Court deems proper and just.

Dated:   July 13, 2020

                                    ERICA H. MacDONALD
                                    United States Attorney

                                     *s/ Andrew Tweeten*

                                    By:   ANDREW TWEETEN
                                    Assistant U.S. Attorney
                                    Attorney ID Number 395190
                                    600 U.S. Courthouse
                                    300 South Fourth Street
                                    Minneapolis, MN   55415
                                    (612) 664-5600
                                    andrew.tweeten@usdoj.gov

                                    Attorneys for Plaintiff

## VERIFICATION

I, Mark L. Altendorfer, verify and declare under penalty of perjury as follows:

I am a Task Force Officer with the U.S. Drug Enforcement Administration ("DEA"). I have extensive experience with narcotics interdiction, having worked in that field for the past three years. I have read the foregoing Verified Complaint *In Rem* and know the contents thereof, and the matters contained in the Verified Complaint are true to my own knowledge, except that those matters not within my knowledge are alleged on information and belief, and I believe those matters to be true.

The sources of my knowledge and information are the official files and records of the United States, information provided to me by other law enforcement agencies and officers, and information I have learned by reviewing reports prepared by other law enforcement agencies and officers, as well as my investigation of this case, together with others, as a Drug Enforcement Administration Task Force Officer.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Dated:   July 13, 2020

                                           *s/ Mark L. Altendorfer*
                                           MARK L. ALTENDORFER
                                           U.S. Drug Enforcement Administration
                                           Task Force Officer